**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARTELL WILKERSON,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KELLER SPEAKS,**<br>**AKEEM EDMONDS,**<br>**CERT OFFICERS JOHN DOE 1–5,**<br>**WENDY WILLIAMS,**<br>**PATRICK ROBINSON,**<br>**MARVIN THOMAS,**<br>**FITZGERALD CLEMONS,**<br>**STATON MEDICAL STAFF DOE 1–5,**<br>**KILBY MEDICAL STAFF DOE 1–5,**<br>***in their individual capacities*,**<br>**and**<br>**CHS AL, LLC d/b/a YESCARE CORP.**<br><br>**Defendants.** | ) | **Case No.:**<br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT</u>**

On January 11, 2024, Plaintiff Martell Wilkerson was beaten by members of the Alabama Department of Correction's Correctional Emergency Response Team ("CERT") during a CERT operation at Staton Correctional Facility. As Martell was raising his hands to his head to comply with a CERT officer's command, another CERT officer began punching him. More CERT officers quickly joined in, punching, kicking, and hitting him with their hands and batons. Martell was knocked to the ground, where the officers continued to assault him. Martell was taken to the infirmary, where he was denied adequate medical care. In an effort to hide the officers' assault of Martell, he was immediately transferred to a different facility, held in lockup for months, and falsely charged with a rule violation.

The use of excessive force by CERT officers is endemic within Alabama's prisons, and Martell's assault was one of many incidents in the last several years during which CERT officers have used unnecessary and often brutal force against a compliant prisoner. Martell brings this action against the CERT officers who beat him, their supervisors, who created and perpetuated the customs and policies that led to his beating, and the medical staff and company who denied him adequate medical care. Each of these individuals violated his rights under the United States Constitution and Alabama State law.

## JURISDICTION AND VENUE

1. Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights conferred by the Eighth Amendment to the United States Constitution.

2. This Court has subject-matter jurisdiction over Plaintiff's constitutional claims under 28 U.S.C. §§ 1331 and 1343(a).

3. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

### *Plaintiff*

5. **Plaintiff Martell Wilkerson** is over the age of nineteen and is incarcerated within the Alabama Department of Corrections ("ADOC" or "Department"). At the time of the filing of this Complaint, Martell was incarcerated at Ventress Correctional Facility ("Ventress") in Barbour County, Alabama. At all times relevant to this Complaint, Martell was incarcerated at Staton

Correctional Facility ("Staton") in Elmore County, Alabama, or Kilby Correctional Facility in Montgomery County, Alabama.

***Defendants***

*The Defendant CERT Officers*

6. **Defendant Keller Speaks** is over the age of nineteen and is a correctional sergeant and CERT officer. As a CERT officer, Defendant Speaks is responsible for the safety and security of all prisoners subject to the CERT operations he is involved in. This responsibility includes: not using excessive force against prisoners; taking reasonable action to stop other CERT officers and/or ADOC employees from using excessive force against prisoners; and taking reasonable action to protect all prisoners within the ADOC from any known, substantial risk of serious harm of being subjected to excessive force. Defendant Speaks has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

7. **Defendant Akeem Edmonds** is over the age of nineteen and is a correctional lieutenant and CERT officer. As a CERT officer, Defendant Edmonds is responsible for the safety and security of all prisoners subject to the CERT operations he is involved in. This responsibility includes: not using excessive force against prisoners; taking reasonable action to stop other CERT officers and/or ADOC employees from using excessive force against prisoners; and taking reasonable action to protect all prisoners within the ADOC from any known, substantial risk of serious harm of being subjected to excessive force. Defendant Edmonds has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

8. **Defendant CERT Officers John Doe 1–5** are over the age of nineteen and were CERT officers at all times relevant to this Complaint. As CERT officers, Defendant CERT Officers Doe 1–10 were responsible for the safety and security of all prisoners subject to the CERT operations these defendants were involved in. This responsibility included: not using excessive force against prisoners; taking reasonable action to stop other CERT officers and/or ADOC employees from using excessive force against prisoners; and taking reasonable action to protect all prisoners within the ADOC from any known, substantial risk of serious harm of being subjected to excessive force. Defendant CERT Officers Doe 1–10 each had a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. Each officer is sued in his individual capacity.

9. Collectively, Defendants Speaks, Edmonds, and CERT Officers Doe 1–5 are referred to as the "Defendant CERT Officers."

*The Supervisory Defendants*

10. **Defendant Wendy Williams** is over the age of nineteen, and she was the Deputy Commissioner of Men's Services for the ADOC at all times relevant to this Complaint. She held that position from in or about January 2022 through in or about September 2024. As Deputy Commissioner, Defendant Williams was responsible for ensuring the effective and safe daily operations of all the facilities under her supervision, including Staton. She was the point person on the Department's administrative team regarding institutional security issues, including all incidents of inmate-on-inmate violence and sexual assault, all incidents of officers using excessive force against prisoners, and all circumstances in which CERT was deployed to a facility to address institutional security issues. Defendant Williams also oversaw all aspects of institutional security at the facilities under her supervision, including Staton. This oversight included: reviewing facility

incident reports and investigations related to inmate extortion, robbery, physical assault, and/or sexual assault; reviewing the facility-level investigations into officers' uses of force; reviewing internal audit reports; reviewing facility policies and practices related to use-of-force incidents, investigations, and associated disciplinary actions; reviewing personnel training records and practices; and monitoring and overseeing members of the leadership at the facilities under her supervision to ensure compliance with all directions, regulations, and policies. Defendant Williams was responsible for addressing violations of institutional policies and procedures, and she had the duty, ability, and authority to suggest or require modifications to those policies and procedures and to implement or supervise such changes as necessary to address any associated issue. As Deputy Commissioner, Defendant Williams was a final policymaker for the Department and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

11. **Defendant Patrick Robinson** is over the age of nineteen and is the Director of the ADOC's Correctional Emergency Response Team ("CERT"). As Director, Defendant Robinson oversees all CERT operations across the State of Alabama. He is responsible for setting, overseeing, and enforcing all policies, customs, and practices applicable to CERT operations. He has the duty, ability, and authority to suggest or require changes to CERT policies, customs, and practices, and he is responsible for implementing and/or supervising or overseeing the implementation of any necessary changes. Defendant Robinson is responsible for planning, directing, controlling, and otherwise managing all CERT operations statewide; investigating, disciplining, and deterring CERT officer misconduct, including inappropriate or excessive uses of force; and ensuring the safety and security of all prisoners subject to CERT operations. As Director of CERT, he remains aware of trends within CERT, including trends related to uses of force and

uses of excessive force. Defendant Robinson is a final policymaker for CERT, and he has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

12. **Defendant Marvin Thomas** is over the age of nineteen and is the Commander of Central CERT, a regional CERT subdivision. As Commander, Defendant Thomas supervises and/or assists in supervising all CERT operations within the ADOC's central-region prisons, including Staton. Defendant Thomas is responsible for: supervising and monitoring CERT operations; ensuring the safety and security of all prisoners subject to CERT operations; ensuring the adequate supervision, discipline, and training of all subordinate CERT officers; investigating, disciplining, and deterring subordinate CERT officer misconduct, including inappropriate or excessive uses of force. As Central CERT Commander, he shapes the culture and practices of Central CERT officers and remains aware of trends within CERT, including trends related to uses of force and uses of excessive force. Defendant Thomas is a final policymaker for Central CERT, and he has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

13. **Defendant Fitzgerald Clemons** is over the age of nineteen and is the Central CERT Team Leader. As Team Leader, Defendant Clemons is responsible for: supervising and monitoring CERT operations; ensuring the safety and security of all prisoners subject to CERT operations; ensuring the adequate supervision, discipline, and training of all subordinate CERT officers; monitoring, investigating, disciplining, and deterring subordinate CERT officer misconduct, including inappropriate or excessive uses of force. Defendant Clemons shapes the culture and practices of Central CERT officers and remains aware of trends within CERT, including trends related to uses of force and uses of excessive force. Defendant Clemons has a

duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

14. Collectively, Defendants Williams, Robinson, Thomas, and Clemons are referred to as the "Supervisory Defendants."

*The Medical Defendants*

15. **Defendant CHS AL, LLC d/b/a YesCare Corp. ("YesCare")** is a corporate entity licensed to practice business in the State of Alabama. At all times relevant to this Complaint, YesCare contracted with the ADOC to provide medical care to individuals in the custody of ADOC, including individuals like Martell. As the contracted medical provider for the ADOC, YesCare acted under color of state law. As a health care provider, YesCare owed Martell a duty to treat him under the prevailing standard of care for a person with serious medical needs.

16. **Defendants Staton Medical Staff Doe 1–5** were employees and/or agents of Defendant YesCare who worked at Staton providing medical care to inmates. These defendants were responsible for ensuring that inmates at Staton, including Martell, received adequate medical care. As health care providers, these defendants owed Martell a duty to treat him under the prevailing standard of care for a person with serious medical needs. These defendants are sued in their individual capacities.

17. **Defendants Kilby Medical Staff Doe 1–5** were employees and/or agents of Defendant YesCare who worked at Kilby providing medical care to inmates. These defendants were responsible for ensuring that inmates at Kilby, including Martell, received adequate medical care. As health care providers, these defendants owed Martell a duty to treat him under the prevailing standard of care for a person with serious medical needs. These defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### *CERT and Operation Restore Order at Staton*

18. CERT is comprised of ADOC correctional officers who have gone through specialized training to respond to disturbances, cell extractions, mass contraband searches, riot control, and emergency situations within Alabama's correctional facilities. CERT is the ADOC's equivalent of a police department's SWAT team.

19. CERT is divided into four units: Northern CERT, North-Central CERT, Central CERT, and South-Central CERT.

20. During CERT operations, CERT officers are usually equipped with specialized tactical gear beyond that issued to regular correctional officers. During operations, CERT officers often carry and use tactical shields, extra-long batons, flash-bang shotguns, impact-munitions shotguns, and chemical munitions such as Sabre Red pepper spray, a professional-grade, large-volume version of the pepper spray ADOC's correctional officers usually carry. CERT officers often wear tactical helmets, full-face balaclavas and all-black clothing during operations.

21. CERT officers are widely known by both prisoners and ADOC employees to be particularly aggressive, destructive, and violent. CERT operations often occur immediately after incidents of acute violence or disarray within a prison, and CERT officers respond in kind; they are known to use fear, intimidation, and violence to restore the semblance of order.

22. In late 2023, several widely publicized inmate-on-inmate murders and assaults occurred at Staton. At that time, conditions at Staton were especially deplorable. Dozens of inmates had been banned from their assigned racks by other inmates and forced to sleep on benches, floors, in hallways, and even outside. Drug possession, sale, and use was open and rampant. Contraband

cell phones and electronics were ubiquitous. Extortion, robbery, and physical and sexual assaults were commonplace.

23. Upon information and belief, Defendant Williams visited Staton in December 2023 or January 2024 and observed these conditions. In response, and knowing CERT's reputation for violence, she ensured that CERT was dispatched to Staton to regain control of the prison.

24. CERT's presence at Staton in January 2024 was referred to as "Operation Restore Order."

25. Operation Restore Order began on January 10, 2024. That day, CERT officers flooded the prison.[1] They conducted a prison-wide "shakedown," searching for contraband of any kind. They confiscated not only drugs, weapons, and electronics, but also extra mattresses, blankets, and even clothing and commissary items. They returned all inmates to their assigned housing units and beds and conducted a Master Roster Count.[2]

26. CERT maintained a constant presence of several dozen officers at Staton for at least the next thirty days to help solidify the changes from their shakedowns and reorganizations.

***Martell's Beating***

27. Martell entered the ADOC in 2009 at the age of nineteen. As of January 2024, he had been incarcerated at Staton for about four years. At that time, he was assigned to D-1 (D-dorm, Bay 1).

---

[1] Upon information and belief, approximately ninety CERT officers were present at Staton on January 10, 2024.

[2] A Master Roster Count involves verifying that each prisoner is on his assigned bed ("rack") or in his assigned cell. This is in contrast to the more frequent institutional counts, which merely ensure that the correct number of prisoners are present in the facility.

28. On January 11, 2024, the second day of Operation Restore Order, CERT officers were helping to conduct the morning institutional count throughout the facility, including in D-dorm.

29. D-dorm has a common area, called a "dayroom," that sits between Bays 1 and 3 of the dorm. That morning, inmates from a different bay of D-dorm were in the dayroom, as were several CERT officers.

30. Martell was awoken by a commotion in the dayroom. Knowing that the morning count was about to begin, Martell placed his ID on his bed and went to the bathroom. When Martell went into the bathroom, there were no CERT officers in D-1, and the inmates had not been given any orders about what to do or where to be.

31. Martell was in the bathroom when CERT officers entered D-1. He was brushing his teeth at the sink, and a CERT officer came into the bathroom and told him to go to his rack.

32. Martell began to walk out of the bathroom, and another CERT officer stopped him and told him to put his hands on his head. Martell took a small step back, said, "Sure," and began to raise both his hands behind his head.

33. As Martell lifted his hands, Defendant Speaks put his hand on Martell's right shoulder, stopping Martell from putting his hand behind his head.

34. Defendant Speaks then hit Martell in the face with his baton. Defendant Edmunds joined in the assault, as did Defendant CERT Officers Doe 1–5. The officers continued to assault Martell, hitting, punching, and kicking him. Martell was eventually knocked to the ground. Defendants continued to assault Martell as he lay on the ground, punching and kicking him, stomping on him, and hitting him with their hands and batons. Defendant Speaks sat on Martell's chest and punched him repeatedly in the face.

35. During Martell's beating, none of the Defendant CERT Officers tried to stop the other Defendant CERT Officers from beating Martell.

36. While the Defendant CERT Officers were assaulting Martell, he tried only to protect himself from their blows; he was not aggressive or threatening.

37. After the Defendant CERT Officers stopped beating Martell, he was taken to the infirmary. He was covered in blood and obviously seriously injured. He had cuts, bruises, and swelling on his face, neck, back, and torso. He was bleeding from both of his ears. He was disoriented and dizzy, and he had a severe headache.

38. Despite his appearance, however, and his associated obvious serious medical needs, Defendants Staton Medical Staff Doe 1–5 refused to provide him with adequate medical treatment. Instead, Defendants Staton Medical Staff Doe 1–5 stitched a cut on his face between his eyebrows. They gave him no other medical treatment and refused to send him to an outside hospital.

39. Upon information and belief, Defendants Staton Medical Staff Doe 1–5 denied Martell adequate medical treatment pursuant to the policy, practice, or custom of Defendant YesCare to deny comprehensive treatment to prisoners in order to save money. This policy, practice, or custom is based entirely on financial considerations; it is not based on medical judgment or an individualized determination of a prisoner's medical needs.

40. Martell was taken from the infirmary to a holding cell at Staton. Several hours later, he was shipped to Kilby Correctional Facility. When Martell arrived at Kilby, he told Defendants Kilby Medical Staff Doe 1–5 that he was very dizzy and lightheaded and thought he had a concussion. Martell was given a body chart and kept in the Kilby infirmary for observation.

41. They did not give him any additional medical treatment. And despite knowing of his head injuries, they did not send him to an outside hospital for additional diagnostic tests or treatment.

42. Upon information and belief, Defendants Kilby Medical Staff Doe 1–5 denied Martell adequate medical treatment pursuant to the policy, practice, or custom of Defendant YesCare to deny comprehensive treatment to prisoners in order to save money. This policy, practice, or custom is based entirely on financial considerations; it is not based on medical judgment or an individualized determination of a prisoner's medical needs.

43. Because of the lack of adequate medical treatment, Martell experienced unnecessary and extended pain and suffering. He also developed an infection in the cut on his back.

44. In an attempt to cover up Martell's unjustified beating, Defendant Speaks wrote him a disciplinary falsely accusing him of inciting a riot. At his disciplinary hearing, Defendant Speaks gave false testimony that resulted in Martell being found guilty of the disciplinary.

45. Martell has permanent physical scars from the Defendant CERT Officers' assault. He has chronic headaches and recurrent migraines, and he has been diagnosed with severe, chronic PTSD from the assault. He experiences flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise. He also developed a rapid heart rate and elevated blood pressure.

***The Widespread History of Excessive Force by CERT Officers***

46. In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions inside Alabama's prisons for men. Among other things, the

investigation examined whether Alabama adequately protects its prisoners from excessive force by correctional officers.[3]

47. During its investigation, the DOJ: (a) conducted site visits at four of Alabama's prisons for men; (b) interviewed dozens of ADOC employees, including wardens, captains, medical and mental-health staff, and high-ranking ADOC officials; (c) interviewed prisoners and their family members; and (d) reviewed hundreds of thousands of pages of the ADOC's own documents related to uses of force and employee discipline between 2015 and 2019.

48. In July 2020, the DOJ published a report documenting its findings about the use of excessive force throughout the ADOC (the "July 2020 Report").[4]

49. The DOJ found that there was "reasonable cause to believe that the correctional officers within the [ADOC] frequently use excessive force on prisoners housed throughout Alabama's prisons for men"; that the use of excessive force was "pervasive" and "pursuant to a pattern or practice"; and that "[t]he systemic use of excessive force within Alabama's prisons for men violates the Eighth Amendment."[5]

50. The DOJ identified several specific ways in which the ADOC's correctional officers frequently use unconstitutional excessive force against prisoners. It found that officers:

a. "[U]se force in the absence of a physical threat," including against "restrained or compliant" prisoners.[6]

---

[3] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at* https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[4] U.S. Dep't of Justice, *Investigation of Alabama's State Prisons for Men* (July 23, 2020) ("July 2020 Report"), *available at* https://www.justice.gov/crt/case-document/file/1297031/dl.

[5] *Id.* at 1, 7.

[6] *Id.* at 20.

b. "[U]se force to punish prisoners when the prisoner's response or behavior may not accord with the officer's commands, even though the prisoner does not physically resist or present a reasonably perceived threat to others."[7]

c. "[U]se chemical spray inappropriately. Prisoners who do not present a danger are frequently sprayed with chemical agents. . . . Chemical spray is regularly used as retribution."[8]

51. The July 2020 Report detailed many specific examples of the "frequent uses of excessive force" throughout the ADOC.[9] Many, many more uses of excessive force have occurred throughout the ADOC in the years since.

52. The use of excessive force by CERT officers occurs within this broader context of the ADOC's long history of excessive force. All CERT officers are employed by the ADOC as regular correctional officers, and they spend the majority of their workweek working in that capacity at ADOC facilities across the state. In doing so, they are privy to and a part of the ADOC's widespread history of excessive force.

53. CERT officers, however, are especially notorious for engaging in unprovoked and extreme violence against prisoners. They often respond to the slightest indication of objection, resistance, or non-immediate compliance from prisoners with physical violence. It is common for CERT officers to physically assault a prisoner whom the officers merely *perceive* to be opposing or defying them. A prisoner who *actually* opposes or defies a CERT officer is likely to be brutally

---

[7] *Id.* at 14.

[8] *Id.* at 15.

[9] *Id.* at 1.

assaulted by multiple officers. CERT creates compliance—and the resulting semblance of order—through fear, intimidation, and brutality.

54. The following incidents are examples of excessive force carried out by CERT officers during CERT operations.

55. In 2016, the ADOC settled five different prisoners' excessive-force lawsuits, each of which stemmed from a single nighttime CERT operation at Holman prison. CERT officers beat multiple prisoners that night, and at least one man was transported to a hospital.

56. In July 2018, a CERT officer beat a prisoner at Holman who was lying facedown on his bed with a baton for 15 to 20 minutes. The prisoner received medical treatment for his injuries only after he crawled to a phone and called his mother, who contacted the warden.

57. In December 2018, CERT officers at Holman beat a prisoner in a wheelchair until he fell out of his wheelchair. They continued to beat and stomp on him until he lost consciousness and defecated himself.

58. That same month, a CERT officer punched an inmate at Holman in the face without provocation, fracturing his nose.

59. In January 2020, CERT officers handcuffed an inmate at Fountain, took him to a secluded area, and beat him. The inmate was taken to the hospital.

60. In March 2020, an early morning CERT raid at Staton turned violent when multiple officers beat compliant inmates. Officers broke an inmate's arm, another inmate required stitches after an officer slammed his head into a bed, and an officer broke an inmate's hand with his baton.

61. In April 2020, CERT officers hit sleeping inmates with batons at Ventress.

62. In July 2020, a CERT officer at Staton punched a handcuffed inmate in the face and kicked him.

63. In November 2020, a CERT officer rammed an inmate's head into a wall at Fountain.

64. In May 2021, CERT officers beat a man at Bibb.

65. In August 2021, CERT officers at Staton punched and hit people as they lay in their beds.

66. In October 2021, CERT officers hit and slapped inmates without provocation during a shakedown at Bibb.

67. In July 2022, CERT officers beat an inmate in the head and kicked him in a bathroom at Staton.

68. In August 2022, CERT officers hit multiple inmates at Limestone, then bragged about "whooping ass."

69. In September 2022, an inmate at Limestone was talking during chow, so CERT officers beat him.

70. In November 2022, CERT officers took a man at Bibb into a room without cameras and punched him in the face.

71. In February 2023, CERT officers hit and slapped inmates at Ventress.

72. In March 2023, CERT officers at Ventress broke a mental health patient's jaw while he was in handcuffs.

73. In August 2023, an inmate placed his hands on the wall of a corridor as CERT officers passed through. After frisking the inmate and finding no contraband, the officers shoved him onto the ground and beat him.

74. In September 2023, a CERT officer slapped multiple inmates during a shakedown at Bibb.

75. In November 2023, CERT officers beat an inmate at Easterling.

76. In December 2023, a CERT officer assaulted an inmate at Kilby.

***The Supervisory Defendants Failed to Respond Reasonably to the Frequent Use of Excessive Force by CERT Officers***

77. Because of their positions in the ADOC, each Supervisory Defendant had the duty, ability, and authority to reduce the frequency with which CERT officers engaged in excessive force during CERT operations. Nevertheless, each Supervisory Defendant failed to take reasonable action to do so.

78. Because of their positions in the ADOC, each Supervisory Defendant knew the policies, practices, and customs related to use-of-force incidents and investigations during CERT operations, and each Supervisory Defendant was responsible for ensuring that these policies, practices, and customs adequately protected prisoners subject to CERT operations from unconstitutional uses of force.

79. Each Supervisory Defendant had the duty, ability, and authority to create and/or modify policies, practices, and customs during CERT operations in ways that would have reduced the incidence of excessive force during CERT operations.

80. Each Supervisory Defendant had the duty, ability, and authority to manage, supervise, and/or oversee CERT operations in ways that would have reduced the incidence of excessive force during CERT operations.

81. Each Supervisory Defendant also had the duty, ability, and authority to supervise, train, and/or discipline CERT officers in ways that would reduce the incidence of excessive force during CERT operations. Each Supervisory Defendant could have done so by (a) instructing the Supervisory Defendant's subordinate or subordinates to supervise, train, and/or discipline an offending CERT officer; or (b) suggesting, implementing, and/or enforcing policies and practices

that resulted in the supervision, training, and/or discipline of CERT officers who engaged in excessive force during CERT operations.

82. Supervisory Defendants nevertheless failed—both individually and collectively—to take the above or any other reasonable corrective action to reduce the use of excessive force by CERT officers during CERT operations.

83. Each of these failures described above, as well as other failures by the Supervisory Defendants that are yet unknown, caused Martell's beating.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE EIGHTH AMENDMENT – EXCESSIVE FORCE
### Against the Defendant CERT Officers

84. Plaintiff incorporates by reference Paragraphs 1–9 and 18–36 of this Complaint.

85. As CERT officers, the Defendant CERT Officers were responsible for ensuring the safety and security of all prisoners subject to CERT operations, including Plaintiff.

86. Instead, the Defendant CERT Officers used excessive, unnecessary, and unlawful force against Plaintiff when they individually and collectively punched, hit, kicked, and stomped Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

87. In beating Plaintiff, the Defendant CERT Officers acted maliciously and sadistically with the intent to cause harm, not in a good-faith effort to maintain or restore discipline. These motives are demonstrated by several facts, including: (a) Plaintiff was attempting to comply with a CERT officer's direction to place his hands on his head when he was assaulted; (b) Plaintiff followed all the orders and instructions given to him; and (c) Plaintiff never gave any verbal or physical indication that he intended to resist or oppose the Defendant CERT Officers.

88. As a direct and proximate result of the Defendant CERT Officers' use of excessive force, Plaintiff suffered physical injury and ongoing emotional distress, including permanent physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

## COUNT II
### VIOLATION OF THE EIGHTH AMENDMENT – FAILURE TO INTERVENE
### Against the Defendant CERT Officers

89. Plaintiff incorporates by reference Paragraphs 1–9 and 18–36 of this Complaint.

90. The Defendant CERT Officers were each responsible for ensuring the safety and security of all prisoners subject to CERT operations, including Plaintiff. The Defendant CERT Officers were therefore each obligated to take reasonable actions to prevent Plaintiff from being subjected to excessive force by other CERT officers, including by intervening to stop the use of excessive force against Plaintiff.

91. The Defendant CERT Officers all observed the other Defendant CERT Officers using excessive, unnecessary, and unlawful force against Plaintiff when the Defendant CERT Officers individually and collectively punched, hit, kicked, and stomped Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

92. The Defendant CERT Officers each had the duty, ability, and authority to stop or mitigate the other Defendant CERT Officers' use of excessive, unnecessary, and unlawful force against Plaintiff.

93. Nevertheless, the Defendant CERT Officers took no action at all to stop or mitigate the other Defendant CERT Officers' assault of Plaintiff.

94. As a direct and proximate result of the Defendant CERT Officers' use of excessive force, Plaintiff suffered physical injury and ongoing emotional distress, including permanent

physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

## COUNT III
### VIOLATION OF THE EIGHTH AMENDMENT – SUPERVISORY LIABILITY
### Against the Supervisory Defendants

95. Plaintiff incorporates by reference Paragraphs 1–14, 18–37, and 46–83 of this Complaint.

96. Through the actions described above, the Defendant CERT Officers violated Plaintiff's clearly established Eighth Amendment rights when they individually and collectively punched, hit, kicked, and stomped Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

97. Because of their positions within the ADOC, including their duties, responsibilities, ranges of knowledge, and domains of authority, as described more fully and specifically for each Supervisory Defendant in Paragraphs 10–14 and 77–83 above, each Supervisory Defendant knew of the widespread history of CERT officers' uses of excessive force during CERT operations, but each Supervisory Defendant nevertheless failed to take any corrective action to minimize such uses of force.

98. Because of their positions within the ADOC, as described more fully and specifically for each Supervisory Defendant in Paragraphs 10–14 and 77–83 above, each Supervisory Defendant had the duty, authority, and ability to take corrective action that would have minimized the use of excessive force against prisoners during CERT operations, but each Supervisory Defendant nevertheless failed to take any corrective action to minimize such uses of force.

99. The failure by each Supervisory Defendant to take any action to minimize the use of excessive force against prisoners during CERT operations was done with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners subject to CERT operations, including Plaintiff, and was objectively unreasonable.

100. As a result of each of the Supervisory Defendants' failures described above, Plaintiff suffered physical injury and ongoing emotional distress, including permanent physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

## COUNT IV
### STATE LAW NEGLIGENCE
### Against the Defendant CERT Officers

101. Plaintiff incorporates by reference Paragraphs 1–9 and 18–36 of this Complaint.

102. Each of the Defendant CERT Officers owes a duty to exercise ordinary and reasonable care for the protection of all prisoners subject to CERT operations, including Plaintiff.

103. Each of the Defendant CERT Officers breached the standard of care he owes to Plaintiff by maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, individually and collectively punching, hitting, kicking, and stomping Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

104. As a direct and proximate result of the Defendant CERT Officers' breaches of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including permanent physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

105. The risks and harms that the Defendant CERT Officers caused Plaintiff are within the scope of protection afforded by the duties the Defendant CERT Officers owe to Plaintiff.

## COUNT V
### State Law Negligence
### Against the Supervisory Defendants

106. Plaintiff incorporates by reference Paragraphs 1–14, 18–37, and 46–83 of this Complaint.

107. Each Supervisory Defendant owed or owes a duty to exercise ordinary and reasonable care for the protection of all people subject to CERT operations, including Plaintiff.

108. Each Supervisory Defendant breached the standard of care he or she owes or owed to Plaintiff by failing to take reasonable steps to reduce the incidence of excessive force by CERT officers.

109. As a direct and proximate result of Supervisory Defendants' breaches of the duty of care they owe or owed to Plaintiff, the Defendant CERT Officers maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, individually and collectively punched, hit kicked, and stomped Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

110. As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including permanent physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

111. The risks and harms the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owe or owed to Plaintiff.

## COUNT VI
### STATE LAW WANTONNESS
### Against the Defendant CERT Officers

112. Plaintiff incorporates by reference Paragraphs 1–9 and 18–36 of this Complaint.

113. Each of the Defendant CERT Officers owes a duty to exercise ordinary and reasonable care for the protection of all prisoners subject to CERT operations, including Plaintiff.

114. Each of the Defendant CERT Officers breached the standard of care he owes to Plaintiff by maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, individually and collectively punching, hitting, kicking, and stomping Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

115. The Defendant CERT Officers' breaches of the duty they owe to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals subject to CERT operations.

116. As a direct and proximate result of the Defendant CERT Officers' breaches of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including permanent physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

117. The risks and harms that the Defendant CERT Officers caused Plaintiff are within the scope of protection afforded by the duties the Defendant CERT Officers owe to Plaintiff.

## COUNT VII
### STATE LAW WANTONNESS
### Against the Supervisory Defendants

118. Plaintiff incorporates by reference Paragraphs 1–14, 18–37, and 46–83 of this Complaint.

119. Each Supervisory Defendant owed or owes a duty to exercise ordinary and reasonable care for the protection of all people subject to CERT operations, including Plaintiff.

120. Each Supervisory Defendant breached the standard of care he or she owes or owed to Plaintiff by failing to take reasonable steps to reduce the incidence of excessive force by CERT officers.

121. The Supervisory Defendants' breaches of the duty they owed or owe to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals subject to CERT operations.

122. As a direct and proximate result of Supervisory Defendants' breaches of the duty of care they owe or owed to Plaintiff, the Defendant CERT Officers maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline, individually and collectively punched, hit kicked, and stomped Plaintiff, even though he was compliant, not resisting, and posed no threat to person or property.

123. As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including permanent physical scars, chronic headaches, recurrent migraines, elevated blood pressure, PTSD, flashbacks, nightmares, anxiety, hypervigilance, and sensitivity to noise.

124. The risks and harms the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owed or owes to Plaintiff.

## COUNT VIII
### VIOLATION OF THE EIGHTH AMENDMENT – DENIAL OF ACCESS TO MEDICAL CARE
### Against Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5

125. Plaintiff incorporates by reference Paragraphs 1–5, 15–17, and 18–45 of this Complaint.

126. Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 were each responsible for providing Plaintiff with minimally adequate medical care.

127. As described above, Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 knew that Plaintiff had serious medical needs and faced a substantial risk of harm if his serious medical needs were not met. Nonetheless, Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 refused to treat Plaintiff's serious medical needs and refused to ensure that someone else treated Plaintiff's serious medical needs.

128. The failures of Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 resulted in Plaintiff's serious physical injuries and acute pain at the time of and immediately after the beating being left untreated, causing Plaintiff significant pain and suffering and resulting in him experiencing a lasting disability and permanent disfigurement.

## COUNT IX
### VIOLATION OF THE EIGHTH AMENDMENT – DENIAL OF ACCESS TO MEDICAL CARE
### Against Defendant YesCare

129. Plaintiff incorporates by reference Paragraphs 1–5, 15–17, and 18–45 of this Complaint.

130. YesCare, on its own or through the final decisions of policymakers, had a policy, practice, or custom of delaying and/or denying inmates, including Plaintiff, access to necessary medical care, in order to minimize costs.

131. YesCare, on its own or through the final decisions of policymakers, had a policy, practice, or custom of deciding whether to give inmates, including Plaintiff, access to necessary medical care based on cost rather than medical necessity and with the primary goal of minimizing costs.

132. Pursuant to these policies, Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 refused to provide Plaintiff with adequate medical treatment after his

assault, including by refusing to send him to an outside hospital for additional diagnostic tests or treatment.

133. YesCare's denial of medical treatment to Plaintiff, as described above, has caused Plaintiff significant pain and suffering and resulted in him experiencing a lasting disability and permanent disfigurement.

**COUNT X**
**MEDICAL MALPRACTICE**
**Against Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5**

134. Plaintiff incorporates by reference Paragraphs 1–5, 15–17, and 18–45 of this Complaint.

135. As a health care provider, Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 owed Plaintiff a duty to treat him under the prevailing standard of care for a person with a serious medical need—specifically a person who had suffered a serious physical assault.

136. As described above, Defendants Staton Medical Staff Doe 1–5 and Kilby Medical Staff Doe 1–5 violated the prevailing standard of care, and as a result, Plaintiff has endured significant pain and suffering and has a lasting disability and is permanently disfigured.

**COUNT XI**
**MEDICAL MALPRACTICE**
**Against Defendant YesCare**

137. Plaintiff incorporates by reference Paragraphs 1–5, 15–17, and 18–45 of this Complaint.

138. As a health care provider, YesCare owed Plaintiff a duty to treat him under the prevailing standard of care for a person with a serious medical need—specifically a person who had suffered a serious physical assault.

139. As described above, YesCare, on its own or through the final decisions of policymakers, violated the prevailing standard of care, and as a result, Plaintiff has endured significant pain and suffering and has a lasting disability and is permanently disfigured.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a. Find in favor of Plaintiff on all counts;

b. Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

c. Award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial;

d. Award Plaintiff recovery of attorneys' fees and other costs; and

e. Award any other relief the Court deems appropriate.

Plaintiff demands a trial by jury.

Respectfully submitted this 11th day of January 2026.

***/s/ Susanne Emily Cordner***
Susanne Emily Cordner
(ASB-4687-C61N)
Lillian McLemore
(ASB-7561-W44E)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
lmclemore@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com
*Attorneys for Plaintiff*